## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

FEB - 2007

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| v.  ) | **Criminal No. 05-394 (RBW)** |
| ) | |
| **I. LEWIS LIBBY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| **DAVID E. SANGER,** ) | 07-50 misc. |
| ) | **Miscellaneous No.** ~~05-394~~ |
| **Movant.** ) | |

### DAVID E. SANGER'S MOTION TO QUASH DEFENDANT I. LEWIS LIBBY'S RULE 17(a) SUBPOENA, AND SUPPORTING MEMORANDUM OF LAW

David E. Sanger, a reporter for *The New York Times*, hereby moves to quash the subpoena issued to him under Rule 17(a) of the Federal Rules of Criminal Procedure ("Rule 17(a)") by Defendant I. Lewis Libby. The subpoena should be quashed because it is unnecessarily intrusive and seeks immaterial testimony.

### BACKGROUND

On January 24, 2007, counsel to *The New York Times* received a subpoena *ad testificandum* issued to David E. Sanger by counsel for Mr. Libby. *See* Declaration of George Freeman, Esq. ("Freeman Decl."), copy attached as Exhibit A, at ¶ 2.[1] The subpoena specifies a return date of January 25, 2007. *Id.* However, when making

---

[1] Counsel for *The New York Times* agreed to accept service for Mr. Sanger to obviate the need for Mr. Libby's counsel to locate and effect personal service upon Mr. Sanger.

arrangements for delivery of the subpoena, counsel for Mr. Libby advised that Mr.

Sanger will not be called to testify until during or after the week of February 5, 2007. *Id.*

In describing the purpose of Mr. Sanger's proposed testimony, Mr. Libby's

counsel stated that Mr. Sanger interviewed Mr. Libby on July 2, 2003, and that the

defense plans to elicit testimony regarding what Mr. Libby did say, and *did not* say,

during the interview. Freeman Decl. at ¶ 3. According to Mr. Libby's counsel, the

defense expects to elicit testimony from Mr. Sanger that Mr. Libby *did not* mention

Valerie Plame, or identify her in any way as a CIA agent, during the July 2 interview. *Id.*

Mr. Sanger did interview Mr. Libby on or about July 2, 2003. Declaration of

David E. Sanger ("Sanger Decl."), copy attached as Exhibit B, at ¶ 2.[2]   A White House

press aide was present at all times during the interview. To the best of Mr. Sanger's

recollection, that press aide was Cathie Martin, Assistant to the Vice President for Public

Affairs. *Id.*

## ARGUMENT

The subpoena issued to Mr. Sanger should be quashed because it seeks testimony in

contravention of the qualified reporter's First Amendment and common law privileges, which

require that witnesses other than the journalist should be called to testify if the information

sought is available from alternative sources. The First Amendment and the common law

privileges for reporters, long recognized in this Circuit, are clearly implicated by an intrusion

into a journalist's news gathering activities, even if the source later waives confidentiality in the

interview. Furthermore, the testimony sought from Mr. Sanger is immaterial to any matter

---

[2] While Mr. Sanger does not recall the exact date of the interview, we hereafter refer to the July 2 date based upon our understanding that it is also Mr. Libby's position that the interview took place on or about that date.

alleged in the Indictment or otherwise in issue. At a minimum, the important policy interests

served by the First Amendment and common law reporter's privileges require that a trial court be

scrupulous in carefully examining whether testimony sought from a reporter is actually relevant

and material to an issue in controversy in the case.

## I.      Legal Standard

Rule 17(a) authorizes a defendant to compel the attendance of witnesses at pre-trial

hearings or at trial. However, "[n[either rich nor poor defendants have an unfettered right to

subpoenas without discretionary review by the district court." *United States v. Bennett*, 675 F.2d

596, 598 (4th Cir. 1982). Trial judges have quashed Rule 17 subpoenas issued to reporters by

defendants finding that the testimony sought is privileged. *See, e.g., United States v. Ahn*, 231

F.3d 26, 37 (D.C. Cir. 2000); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986)

(finding that defendant failed to show that information sought from reporter was otherwise

unavailable and that there was a compelling interest in securing reporter's testimony); *United

States v. Hubbard*, 493 F. Supp. 202, 204–05 (D.D.C. 1979) (same).  Rule 17 subpoenas have

also been quashed where the testimony sought was irrelevant or inadmissible hearsay. *See, e.g.,

Ahn*, 231 F.3d at 37; *Bennett*, 675 F.2d at 598; *United States v. Cuthbertson*, 651 F.2d 189, 195

(3d Cir. 1981); *Hubbard*, 493 F. Supp. at 205.

## II.     The Important Public Interests Served By The Reporter's Privileges Outweigh Mr. Libby's Need For The Testimony Of Mr. Sanger

In *United States v. Libby*, 432 F. Supp. 2d 26, 45 (D.D.C. 2006), this Court conducted an

in-depth analysis of the "profound constitutional issue of first impression in this Circuit" that is

implicated where a defendant subpoenas a journalist to produce documents for use at trial. The

Court considered the conflicting case authority addressing whether, in determining if such a trial

subpoena should be enforced, the First Amendment requires a balancing of the public's interest

in unfettered news gathering against a defendant's private interest in compelled disclosures. *Id.* at 43–48. The Court concluded that the First Amendment did not prevent reporters and news organizations from producing "relevant and admissible" documents for a defendant's possible use at trial in instances where the reporters "are themselves *critical* to both the indictment and prosecution of criminal activity." *Id.* at 44, 47–48 (emphasis added); *see also Ahn*, 231 F.3d at 37 (stating that defendant must show that the information sought is "essential and crucial" to his case). Thus, the Court limited the documents that "need[ed] to be produced to those relating to the principal news reporters in this case [who were] personally involved in conversations with the defendant that form the predicate for several charges in the indictment." *Libby*, 432 F. Supp. 2d at 43. Clearly, the ruling was a narrow one that, as the Court explained, "*will not* . . . open the gates for either the government or a criminal defendant to learn the identity of all sources of a reporter or to gain access to all information a reporter has amassed." *Id.* at 48 (emphasis added).

It is unnecessary to reiterate here the extensive judicial authority recognizing the important public interests served by the First Amendment reporter's privilege, and its common law analog, that this Court thoroughly considered in this case just eight months ago.[3] But those authorities, we respectfully submit, require a different result under the markedly different circumstances of the subpoena issued to Mr. Sanger. First, Mr. Sanger *is not* a reporter whose conversations with Mr. Libby "form the predicate for several charges in the indictment." *Libby*, 432 F. Supp. 2d at 48. Indeed, Mr. Libby seeks to elicit testimony from Mr. Sanger that there

---

[3] *See* Misc. No. 1:06-MC-00169-RBW, New York Times' Motion To Quash Defendant I. Lewis Libby's Rule 17(c) Subpoena, And Supporting Memorandum of Law [Dkt. No. 1] at §§ III.C.1 and III.C.3, and New York Times' Reply To Defendant Lewis I. Libby's Response To Motion Of The New York Times To Quash Libby's Rule 17(c) Subpoena, And Supporting Memorandum of Law [Dkt. No. 6] at §§ II.A and II.C, which are incorporated herein by reference.

was *no* discussion in the July 2, 2003 interview regarding one of the core factual issues in this case -- the identity and occupation of Valerie Plame. Second, the information sought from Mr. Sanger *is not* "only [] available from the news reporters or news organizations themselves." *Id.* at 48 n.27. Rather, Mr. Libby could elicit the very same testimony that Mr. Libby seeks to elicit from Mr. Sanger from the White House press aide who was present for the interview.

      A.     <u>Mr. Libby Has No Legitimate Need For Mr. Sanger's Testimony.</u>

      The lynchpin of the Court's earlier decision in *Libby* was the determination that the specific documents sought were "relevant and admissible." *Id.* at 48. Here, the testimony sought from Mr. Sanger, while of minimal relevance, is of dubious admissibility. The charges against Mr. Libby concern his grand jury testimony, and statements to Special Agents of the Federal Bureau of Investigation, regarding what Mr. Libby discussed with Tim Russert on July 10, 2003, with Matthew Cooper on July 12, 2003, and with Judith Miller on July 12, 2003. Indictment at Count One (¶¶ 32–33), Count Two (¶¶ 3–4), Count Three (¶¶ 2–3), Count Four (¶¶ 2–3), and Count Five (¶¶ 2–3). That Mr. Libby may not have revealed Valerie Plame's identity or occupation to Mr. Sanger during the July 2 interview does not make more or less probable either that: (1) Mr. Libby in fact knew Ms. Plame's identity and occupation on or before July 10 when he spoke with Tim Russert, or on July 12 when Mr. Libby spoke to Matthew Cooper and Judith Miller; or (2) that in fact Mr. Libby disclosed that information to the reporters on July 10 and July 12.

      Significantly, after Mr. Libby was interviewed by Mr. Sanger on July 2, 2003, but before Mr. Libby's discussions with reporters on July 10 and July 12, *The New York Times* published the July 6 Op-Ed article by Joseph Wilson regarding his 2002 trip to Niger. Even if it is the defense theory that on July 2 Mr. Libby did not know Ms. Plame's identity and occupation, or

knew it but did not recall it -- and seeks Mr. Sanger's testimony to "prove" this circumstance --

the July 6 Wilson Op-Ed article represents an independent trigger for Mr. Libby's acquisition of

that knowledge prior to his discussions with Tim Russert, Matthew Cooper and Judith Miller

during the July 10-12 time frame.  Thus, Mr. Sanger's testimony regarding what he was, and was

not, told by Mr. Libby on July 2 is of little or no evidentiary value in respect of the conduct

charged in this case.

> B.   Mr. Libby Has An Alternative Source For Evidence Of
>      The July 2, 2003 Sanger Interview.

Another individual, a White House press aide, was present throughout the July 2, 2003

interview of Mr. Libby conducted by Mr. Sanger.  Sanger Decl. at ¶ 2.   In all likelihood, that

press aide was Cathie Martin.  *Id.*   Ms. Martin already has testified as a government witness

regarding several conversations for which she was present between Mr. Libby and reporters.  *See*

January 25, 2007 Transcript of Trial, Afternoon Session.[4]  Ms. Martin testified that it was her

common practice to listen in on discussions or calls that Mr. Libby had with reporters, *id.* at 39,

and she has "absolutely no knowledge of Scooter Libby ever discussing with any reporter, any

information concerning Mrs. Wilson or her employment status."  *Id.* at 46.  Ms. Martin also

testified regarding conversations that Mr. Libby had with two particular reporters.  Ms. Martin

testified that in the portion of the July 12, 2003 telephone conversation between Mr. Libby and

*Time* reporter Matt Cooper, she overheard no discussion of Ambassador Wilson's wife.  *Id.* at

27–28.  Ms. Martin also testified that she overheard Mr. Libby's discussion with *Washington

Post* reporter Glenn Kessler, and there was no discussion of Ambassador Wilson's wife during

that conversation.  *Id.* at 29–30.

---

[4] Copies of cited transcript pages attached hereto as Exhibit C.

Clearly, counsel for Mr. Libby has had the opportunity to explore with Ms. Martin the very same topic about which he seeks testimony from Mr. Sanger. Mr. Libby's counsel has already elicited from Ms. Martin a blanket denial of any knowledge that he ever discussed Valerie Plame or her occupation with any reporter. To the extent that Mr. Libby's counsel believes he should develop further evidence of his client's July 2, 2003 discussion with Mr. Sanger, counsel is certainly able to recall Ms. Martin to testify in the defense case. Furthermore, during her testimony during the government case, Ms. Martin referred to detailed notes of communications with reporters.[5] Thus, she may have made notes of the July 2, 2003 Libby-Sanger meeting which would provide further corroboration for her testimony regarding what Mr. Libby said, and did not say, during that interview.

Thus, the testimony that Ms. Martin has already given, and the option available to Mr. Libby to elicit additional testimony from her in his defense case, provides independent grounds for quashing the subpoena to Mr. Sanger. First, Ms. Martin represents an alternative source for the testimony Mr. Libby claims he needs. "[T]he district court should not be required to make the delicate balance of interests required by the [reporter's] privilege unless the defendant first shows that he is unable to acquire the information from another source that does not enjoy the protection of the privilege." *United States v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir. 1980). Second, any testimony that Mr. Sanger could offer regarding the July 2, 2003 interview of Mr. Libby is "merely cumulative" of that Ms. Martin has given and/or is available to provide. *Hubbard*, 493 F. Supp. at 205. The subpoena to Mr. Sanger should be quashed on either or both of these grounds.

---

[5] Mr. Libby's counsel was provided the originals of Ms. Martin's notes on January 25, 2007. *See* January 25, 2007 Transcript of Trial, Morning Session, at 47–48. Copies of cited transcript pages attached hereto as Exhibit D.

C.     The Balance of Interests Weighs In Favor Of Quashing The Subpoena.

This Court has recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Libby*, 432 F. Supp. 2d at 43 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)).  While the Court's earlier ruling regarding the Rule 17(c) subpoenas for the documents of the "principal news reporters" in this case made abundantly clear that the First Amendment protection for reporters "is not absolute," *id.* at 43, that ruling nonetheless allows for the balancing of the reporter's interests against the defendant's need for the information in criminal cases presenting circumstances different than those that were then before the Court.  *Id.* ( "[T]he Court is only concerned here with whether a reporter's privilege exists to shield from disclosure documents relating to these three news reporters.").[6]  Where, as here, the testimony is sought from a reporter who is not a principal in the events underlying the criminal charges, the testimony has little or no evidentiary value, and the same evidence is available from another source, the Court should strike the balance in favor of protecting important First Amendment and common law interests and quash the subpoena.

Finally, it is immaterial that Mr. Libby has waived the agreement of confidentiality between himself and Mr. Sanger regarding the July 2, 2003 interview.  "[T]he privilege belongs to the movant journalist and not to the defendant.  Therefore, even if the notes and tapes in question are of defendant's own words, she is not entitled to 'waive' the privilege for the movant." *Palandjian v. Pahlavi,*, 103 F.R.D. 410, 413 (D.D.C. 1984) (internal citation omitted); *see also In re: Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1177 (D.C.Cir. 2006) (Tatel,

---

[6] *Carey* v. *Hume*, 492 F.2d 631, 636 (D.C.Cir. 1974) (requiring, in a civil case, that the trial court "look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired."); *U.S. v. Hubbard*, 493 F. Supp. at 204 ("[*Branzburg*] has inspired the courts to engage in a case-by-case balancing of interests in order to determine whether a reporter will be required to testify").

J., concurring) ("the privilege belongs to the reporter"); *Cuthbertson*, 630 F.2d at 147 ("[n]or

does the fact that the government has obtained waivers from its witnesses waive [the reporters']

privilege. The privilege belongs to CBS, not the potential witnesses, and it may be waived only

by its holder."); *Anderson* v. *Nixon*, 444 F. Supp. 1195, 1198 (D.D.C. 1978) ("the privilege is

that of the reporter not the informant or the public") (quotations omitted). The reporter's

privilege exists for the purpose of safeguarding the gathering and dissemination of the news, and

thereby serves an interest that is not limited to a single case. While a reporter's source may have

a personal interest in obtaining a reporter's testimony for a certain case, or the government may

compel a waiver from the source -- for example, using continued government employment as

leverage to obtain the waiver -- to serve the prosecution's interest in an investigation or case, the

reporter is aligned with the public in protecting an interest that transcends any particular case.

## CONCLUSION

For the foregoing reasons, the Court should quash the subpoena issued by I. Lewis Libby

to David E. Sanger.

Respectfully Submitted

By: _____
Charles S. Leeper (#310367)
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 842-8800

*Attorney for David E. Sanger*

February 1, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February, 2007, a copy of the above and foregoing **David E. Sanger's Motion To Quash Defendant I. Lewis Libby's Rule 17(a) Subpoena, And Supporting Memorandum Of Law** and attached exhibits was sent via electronic and U.S. mail:

John DeWitt Cline
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104-1500
(415) 875-5812

William H. Jeffress, Jr.
Alex Joseph Bourelly
Alexandra M. Walsh
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
The Warner
Washington, DC 20004
(202) 639-7751

James Lewis Brochin
Theodore V. Wells, Jr.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, NY 10019-6031
(212) 373-3582

Justin O. Kay

NS

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 05-394 (RBW) |
| I. LEWIS LIBBY, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF GEORGE FREEMAN

1.      I am Vice President and Assistant General Counsel of The New York Times

Company, and submit this declaration in support of *The New York Times* reporter David E.

Sanger's Motion to Quash a trial subpoena issued to him by counsel for defendant I. Lewis

Libby.

2.      Sometime in mid-December 2006, I was contacted by Alex J. Bourelly of Baker

Botts LLP, counsel for Mr. Libby, informing me that the defense was considering subpoenaing

Mr. Sanger to testify at the trial of this matter.  I agreed to accept service of the subpoena for Mr.

Sanger, but made clear that he reserved his right to move to quash the subpoena.  Mr. Bourelly

subsequently forwarded the attached subpoena to me, dated January 24, 2007.  As stated in Mr.

Bourelly's letter accompanying the subpoena, although the subpoena bears a return date of

January 25, the defense anticipates calling Mr. Sanger to testify in the week of February 5.

3.      In my initial conversation with Mr. Bourelly, and in subsequent communications

with him regarding Mr. Libby's purpose in calling Mr. Sanger to testify as a defense witness, Mr.

Bourelly explained that the testimony sought from Mr. Sanger would focus on, and be limited to,

an interview of Mr. Libby conducted by Mr. Sanger on July 2, 2003.  Mr. Bourelly stated that

the defense is seeking to have Mr. Sanger testify both about what he and Mr. Libby did discuss,

and what they *did not* discuss, during that July 2 interview.   In the latter category, Mr. Bourelly

explained that the defense expected Mr. Sanger would testify that Mr. Libby did not mention

Valerie Plame, or identify her in any way as a CIA agent, during the July 2 interview.

    4.      During my communications with Mr. Bourelly, he also made clear that Mr. Libby

was waiving the agreement of confidentiality which had been made between Mr. Sanger and Mr.

Libby with respect to the July 2, 2003 interview.

    I declare under penalty of perjury that the foregoing is true and correct.

                              George Freeman

Executed on: January 29, 2007

AO 89 (Rev. 11/91) Subpoena in a Criminal Case

# United States District Court

For The _____ **DISTRICT OF** Columbia _____

United States of America

v.

I. Lewis Libby

**SUBPOENA IN A CRIMINAL CASE**

**CASE NUMBER:** 05-394 (RBW)

**TO:**

   David Sanger

☑ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|-------|-----------|
| United States Courthouse<br>333 Constitution Avenue, N.W.<br>Washington, D.C. 20001 | Courtroom 16 |
| | DATE AND TIME<br>January 25, 2007, 9:00 a.m. |

☐ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT<br>NANCY MAYER-WHITTINGTON | DATE<br>January 24, 2007 |
|-----|-----|
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Alex J. Bourelly, Baker Botts L.L.P., 1299 Pennsylvania Ave., N.W.,
Washington, D.C. 20004-2400, (202) 639-7700

## RETURN OF SERVICE (1)

| RECEIVED BY SERVER | DATE | | PLACE | |
|---|---|---|---|---|
| SERVED | DATE | | PLACE | |

**SERVED ON (PRINT NAME)**

| SERVED BY (PRINT NAME) | | TITLE | |
|---|---|---|---|

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | | TOTAL |
|---|---|---|---|

## DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                        Date                                  Signature of Server

                                     _____
                                     Address of Server

**ADDITIONAL INFORMATION**

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(e), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (18 USC 1825, Rule 17(a) Federal Rules of Criminal Procedure)".

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | )      **Criminal No. 05-394 (RBW)** |
| **I. LEWIS LIBBY,** | ) |
| | ) |
| **Defendant.** | ) |

## DECLARATION OF DAVID E. SANGER

1.      I am the Chief Washington Correspondent for *The New York Times*, and I submit this declaration in support of the accompanying Motion to Quash Defendant I. Lewis Libby's Rule 17(a) Subpoena.

2.      I was *The New York Times*' White House Correspondent in July 2003.  On or about July 2, 2003, I conducted an interview of I. Lewis Libby, Chief of Staff to the Vice President of the United States at his office.  There was a White House press aide present at all times during that interview.  To the best of my recollection, that press aide was Cathie Martin, Assistant to the Vice President for Public Affairs.

I declare under penalty of perjury that the foregoing is true and correct.

_____
David E. Sanger

Executed on: January 31, 2007

# Exhibit C

Page 1

1                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLUMBIA

2       ---------------------------X

3     UNITED STATES of AMERICA    Criminal Case No. 05-394

4                    v.

5     I. LEWIS LIBBY,

6                         Defendant,

7       ---------------------------X        Washington, D.C.

                                          Thurs., January 25, 2007

8                                          1:30 P.M.

9               TRANSCRIPT OF TRIAL, AFTERNOON SESSION

               BEFORE THE HONORABLE REGGIE B. WALTON

10            UNITED STATES DISTRICT JUDGE, and a JURY

11    APPEARANCES:

12    FOR THE GOVERNMENT:   PATRICK FITZGERALD, SPECIAL COUNSEL

                           DEBRA R. BONAMICI, DEPUTY SPEC. COUNSEL

13                         U.S. DEPT. OF JUSTICE

                           OFFICE OF SPECIAL COUNSEL

14                         219 South Dearborn Street

                           Chicago, IL   60604

15                         (312) 353-3741

16                         PETER ZEIDENBERG, AUSA

                           KATHLEEN M. KEDIAN, AUSA

17                         U.S. DEPT. OF JUSTICE

                           1400 New York Ave., N.W.

18                         Room 12-405

                           Washington, D.C.   20005

19                         (202) 514-1412

20

21    Court Reporter:      Lisa Walker Griffith, RPR

                           U.S. District Courthouse

22                         Room 6409

                           Washington, D.C.   20001

23                         (202) 354-3247

24

25    Proceedings recorded by mechanical stenography, transcript

Page 27

1    about reception, and getting cut off.

2    Q    Did you find a phone inside Andrews Air Force Base?

3    A    We did.  There's a lounge area and we asked if we could

4    use the phone.  Scooter, Jenny Mayfield and I went back in

5    the back office and borrowed a phone.

6    Q    And was there just the three of you in the room, you,

7    Mr. Libby and Ms. Mayfield?

8    A    Yes.

9    Q    What type of phone did you use?  Was it a speaker phone

10   or a regular phone?

11   A    A regular phone.

12   Q    Could you hear Mr. Libby's side of the conversation?

13   A    Yes.

14   Q    Could you hear the other side of the conversation?

15   A    No.

16   Q    Describe what you recall about the telephone call

17   between Mr. Libby and Mr. Cooper?

18   A    I recall, to my recollection, he hadn't spoken with

19   Mr. Cooper before.  In fact, I had never spoken with

20   Mr. Cooper before this because Mr. Cooper was new.  He was

21   with TIME but he hadn't been on the White House beat.  He

22   told me he was just back on the White House beat.  We had

23   worked together before.

24            So there was a little chit chat at the beginning.

25   Scooter called him directly.  Then I remember seeing Scooter

Page 28

1   hold the card and saying, I have a quote for you, reading

2   from the card.

3   Q    Did you hear any discussion during the telephone call

4   about Ambassador Wilson's wife?

5   A    No.

6   Q    Did you hear any discussion during the phone call about

7   what other reporters were saying at that time?

8   A    No.

9   Q    What happened after Mr. Libby spoke to Mr. Cooper?

10  A    After he spoke to Mr. Cooper?  We talked about, at some

11  point before we spoke to Mr. Cooper, we talked just generally

12  before I put him on the phone with him.  You know, if we're

13  going to call TIME, okay, this is what we're going to do.

14        And I think Scooter said, well, if we're calling

15  TIME, should we call Newsweek to be fair because we don't

16  normally give these quotes on the record.  And I said, well,

17  they haven't called, but maybe we could.  That's fine.  And

18  we were scrambling for a number for a reporter that we know

19  there named Evan Thomas.  So we were looking around for a

20  number.  I didn't have it with me.

21        So when we hung up with Matt Cooper, I had -- well

22  I don't think we yet had the phone number.  I think we were

23  still trying to get it after the phone call previously.  I

24  had gotten a phone call back from a previous conversation

25  from my press secretary trying to figure out the number.  So

Page 29

1  we talked about we still have to call Evan.

2          And oh, we had this Glenn Kessler call from The

3  Post.  We need to get back to him too, but it had gotten a

4  little bit late.  And it was Scooter's son's birthday, so we

5  were hopeful to move it on.  The so we said, Scooter was

6  anxious to get home.  So we said we'll ride home with you in

7  the van that took you to the Andrews Air Force Base, and you

8  can make these phone calls in the car.  And then we'll go

9  with the van back to the White House.  That way you can get

10  home sooner and be with your child.

11  Q   Did you at any point hear Mr. Libby reach out to

12  Mr. Thomas from Newsweek?

13  A   Yes.  We eventually got the number, and Scooter called

14  and left a message, I believe.  We just left a voice mail

15  message.

16  Q   You mentioned there was a call from Mr. Kessler as well?

17  A   I also had a call from Mr. Kessler who was working on a

18  story.  So Scooter called Mr. Kessler back because he was

19  also waiting for an answer from me, and gave him the answers

20  to his questions, which weren't specifically related to this

21  16 words is my recollection.  But it may have been related to

22  some of the evidence around the 16 words, just the evidence

23  about the war.

24  Q   Any discussion about Mr. Wilson's wife during the

25  conversation that you heard with Mr. Kessler?

Page 30

1   A   No.

2   Q   Directing your attention to the date July 14th, the date

3   that a column appeared under the name of Robert Novak

4   concerning Mr. Wilson's wife, prior to that newspaper

5   article, had any reporters contacted you as the public

6   affairs person in the office of the Vice President and told

7   you that they had heard that Wilson's wife worked at the CIA?

8   A   No, not that I recall.

9   Q   Prior to that date, did Mr. Libby ever tell you that any

10  reporters were telling him that Mr. Wilson's wife worked at

11  the CIA?

12  A   No, not that I recall.

13  Q   Prior to that date, did Mr. Libby ever tell you that

14  Mr. Russert had ever told him, Mr. Libby, that Wilson's wife

15  worked at the CIA?

16  A   No, not that I recall.

17  Q   On July 14th, that's a Monday, did TIME Magazine come

18  out?

19  A   The hard copy of the magazine comes out on Mondays.  But

20  an electronic version of the stories that are relevant to us,

21  we usually receive on Sunday.  They often come out on Sunday

22  so they can, I don't know that so that -- that's probably not

23  fair.  And they're used on Sunday shows.  So sometimes we'll

24  get an electronic version on Sunday, but the hard copy

25  magazine we see on Monday.

Page 39

1  another reporter, right?

2  A   I don't specifically recall making that clear to the

3  FBI, but, yes, I have made it clear that I was on the phone

4  for a portion of the conversation.

5  Q   Right.  So, the jury is clear, when you say you did not

6  hear Mr. Libby say anything about what other reporters were

7  saying, that is just with respect to the portion of his

8  conversation with Mr. Cooper that you were present for,

9  right?

10  A   Right.

11  Q   Now, under -- withdrawn.

12          The common practice with respect to what you should

13  have been doing or what you would have been doing while Mr.

14  Libby was having that call with Mr. Cooper, you would have

15  been on, it would either have been on a speaker phone or you

16  would have been on the other end of another phone actually

17  listening to the whole conversation, right?

18  A   If we'd been in the White House, I would have tried to

19  listen to the conversation on another extension.

20  Q   Right.  And that wasn't possible because you made the

21  phone call from a room in Andrews Air Force Base, right?

22  A   Correct.

23  Q   And because of that, when the call started, you were

24  present and just listening to Mr. Libby's end of the

25  conversation, right?

Page 46

1    conversation.

2    Q    Sure, sure.  However long it took you to utter the

3    sentence that Ambassador Wilson's wife works at the CIA, that

4    would be the approximate length of that portion of the

5    conversation, right?

6    A    Of that portion of the conversation, correct.

7    Q    Because the conversation also involved other information

8    concerning Mr. Wilson's name and the fact that he had

9    asserted position in the Middle East, correct?

10    A    Right.

11    Q    Now, Mr. Fitzgerald asked you a number of questions

12    concerning what took place during the week of July 7th,

13    right?

14    A    Yes.

15    Q    He asked you questions about conversations with Steve

16    Hadley, conversations involving Andrea Mitchell, the Tenet

17    statement, conversations with various reporters,

18    conversations with both the Vice President and Mr. Libby.

19            Now, is it correct, that you have absolutely no

20    knowledge of Scooter Libby ever discussing with any reporter,

21    any information concerning Mrs. Wilson or her employment

22    status?

23    A    I have no knowledge of that.

24    Q    And the conversation that you were asked questions about

25    and your answers involving Andrea Mitchell and Steve Hadley,

# Exhibit D

Page 1

```
 1    (REDACTED.)
 2                        UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 3
      _____
 4    UNITED STATES,                 :
                 GOVERNMENT,         :
 5                                    :
        VS.                           :        CR. NO. 05-394
 6                                    :
                                      :
 7    I. LEWIS LIBBY,                 :
                 DEFENDANT,          :
 8    _____      :
 9                             WASHINGTON, D. C.
                               JANUARY 25, 2007
10                             A. M. SESSION
11                        TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE REGGIE B. WALTON
12
      FOR THE GOVERNMENT:       PATRICK FITZGERALD, SPECIAL COUNSEL
13                              U. S. DEPARTMENT OF JUSTICE
                                219 SOUTH DEARBORN STREET
14                              CHICAGO, ILLINOIS  60604
                                312-353-5300
15
                                DEBRA R. BONAMICI
16                              OFFICE OF SPECIAL COUNSEL
                                219 SOUTH DEARBORN STREET
17                              ROOM 500
                                CHICAGO, ILLINOIS   60604
18                              312-353-3741
19                              PETER ZEIDENBERG, AUSA
                                U. S. DEPARTMENT OF JUSTICE
20                              1400 NEW YORK AVE., N. W.
                                ROOM 12-405.
21                              WASHINGTON, D. C. 20005
                                202-514-1412
22
23    COURT REPORTER:             PHYLLIS MERANA
                                  6423 U. S. COURTHOUSE
24                                333 CONSTITUTION AVE., N. W.
                                  WASHINGTON, D. C. 20001
25                                202-354-3243
```

Page 47

1   ASKING QUESTIONS, HOPING THAT THE JUROR ASKS WHY THEY ASKED.

2        THE COURT:  I WILL HAVE TO DEAL WITH THAT ON AN

3   INDIVIDUAL BASIS BECAUSE I THINK, UNFORTUNATELY -- AND MAYBE

4   THERE WAS A MISPERCEPTION OF WHAT MY RULING WAS, BUT

5   UNFORTUNATELY, I THINK THE WAY THINGS EXIST, AND THE

6   QUESTION THAT HAS NOW BEEN RAISED, I DON'T WANT THE JURY TO

7   HAVE THE IMPRESSION THAT SOMEHOW THINGS WERE JUST BEING

8   PULLED OUT OF THIN AIR AND THAT QUESTIONS ABOUT COUNSEL'S

9   CREDIBILITY IS AT ISSUE.  I JUST DON'T THINK THIS REALLY IS

10  GOING TO HAVE ANY SIGNIFICANT IMPACT, IF ANY, ON THE

11  GOVERNMENT'S CASE AS FAR AS MEMORY IS CONCERNED WITH THE

12  RESTRICTIONS I WILL PUT IN PLAY IN THE EVENT MR. LIBBY

13  DOESN'T TESTIFY.

14        MR. FITZGERALD:  AND I AM JUST SAYING, GOING

15  FORWARD, THAT COUNSEL SHOULD BE AWARE, IF THEY START ASKING

16  QUESTIONS THAT --

17        THE COURT:  YOU CAN OBJECT, AND I WILL MAKE A

18  RULING AS TO WHETHER OR NOT IT'S APPROPRIATE TO GO INTO

19  THOSE SPECIFICS THAT MR. CLINE BROUGHT OUT ON

20  CROSS-EXAMINATION.

21        MR. WELLS:  I AM SORRY.  I HAVE A TOTALLY

22  DIFFERENT ISSUE THAT I WANT TO RAISE BEFORE YOU BRING THE

23  JURY OUT.  MS. MARTIN IS THE NEXT WITNESS.  SHE WAS HEAD OF

24  PUBLIC AFFAIRS FOR THE OFFICE OF VICE-PRESIDENT.

25        THE COURT:  RIGHT.

1          MR. WELLS:  MS. MARTIN TOOK A NUMBER OF NOTES.  WE

2     HAVE BEEN ASKING SINCE SATURDAY TO HAVE THE OPPORTUNITY TO

3     INSPECT THE ORIGINALS OF THE NOTES.  WE HAVE ASKED

4     REPEATEDLY.

5          THEY FINALLY BROUGHT THE NOTES ABOUT 8:30.  THEY

6     SAID I COULD SEE THEM AT 8:30.  WELL, I GOT HERE.  THERE WAS

7     A WHOLE BOX OF NOTES.  I HAVE NOT HAD ADEQUATE TIME TO

8     REVIEW --

9          THE COURT:  I WILL GIVE YOU TIME TO REVIEW THEM.

10         MR. WELLS:  WELL, FINE.  THEN WHAT I WOULD ASK TO

11    DO -- IT'S A SIGNIFICANT -- IT'S A LOT OF MATERIAL AND YOU

12    HAVE TO CROSS-REFERENCE STUFF.  SO WHAT I WOULD ASK -- I

13    UNDERSTAND THE GOVERNMENT PROBABLY HAS MAYBE A COUPLE OF

14    HOURS WITH HER.  AND I WOULD --

15         THE COURT:  I MEAN, I DON'T WANT TO LOSE HALF OF A

16    DAY BECAUSE I THINK IT'S ONLY FAIR -- IF YOU JUST GOT THE

17    NOTES, I THINK, OBVIOUSLY, YOU HAVE A RIGHT TO REVIEW THE

18    NOTES BEFORE YOU DO YOUR CROSS-EXAMINATION.  SO I DON'T WANT

19    TO LOSE A WHOLE DAY.

20         DO WE HAVE ANOTHER WITNESS WE CAN CALL WHO DOESN'T

21    HAVE THAT ISSUE IN PLAY?

22         MR. FITZGERALD:  YOUR HONOR, SO WE ARE CLEAR, THEY

23    HAVE HAD COPIES OF THE NOTES FOR A YEAR.  SO THEY ASKED

24    SATURDAY TO LOOK AT THE ORIGINALS.  WE HAVE BEEN GETTING

25    LOTS OF REQUESTS.  WHEN YOU HAVE THREE LAW FIRMS AND 11