IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> v.  ) Criminal No. 05-394 (RBW) <br> ) <br> I. LEWIS LIBBY, ) <br>         Defendant.  ) <br> ) <br> DAVID E. SANGER, ) <br> ) Miscellaneous No. 1:07MS00050 (RBW) <br>         Movant.  ) | |

**REPLY OF DAVID E. SANGER TO I. LEWIS LIBBY'S OPPOSITION
TO MOTION TO QUASH RULE 17(a) SUBPOENA**

The Opposition of I. Lewis Libby to David E. Sanger's Motion to Quash the Rule 17(a) Subpoena ("Libby Opposition" or "Libby Opp.") overstates Mr. Libby's power to compel the attendance of witnesses at his criminal trial, understates the viability of the First Amendment and common law Reporter's privilege, and incorrectly describes the facts of record regarding the need for and materiality of Mr. Sanger's expected testimony. As demonstrated below, a criminal defendant's right to compel the attendance of witnesses is far from absolute. Moreover, contrary to Mr. Libby's summary references to the prior decisions of this Court regarding the Reporter's privilege, no determination has been made that such a privilege does not exist "in this case." Libby Opp. at 2. In fact, this Court has recognized the profound public interest in unfettered news gathering and, as explained below, the limited circumstances where such an important interest must give way to a defendant's Sixth Amendment rights are not present with respect to



RECEIVED
FEB - 5 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

the subpoena issued to Mr. Sanger. For these reasons, the subpoena issued to Mr. Sanger is unreasonable, seeks immaterial testimony, and should be quashed.

## I. Mr. Libby's Right to Compel Witnesses to Testify Is Not Absolute

The Libby Opposition describes the right of the accused to call witnesses in his defense in sweeping, absolute terms. *Id.* at 1–4. In fact, the very case authority cited in the Libby Opposition, and the well-settled precedent of this and other Circuits, demonstrates that his right to issue subpoenas is not unfettered. While Mr. Libby cites *Taylor v. Illinois*, 484 U. S. 400, 410 (1988) to describe a defendant's subpoena power as a "sword" that he may employ at his "sole[]" discretion, Libby Opp. at 3, the Supreme Court in *Taylor* actually rejected a defendant's argument that "the Sixth Amendment creates an absolute bar to the preclusion of the testimony of a . . . witness." *Taylor*, 484 U.S. at 410 (upholding trial court's exclusion of testimony of defense witness not identified on witness list required under Illinois reciprocal discovery rules). "The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony." *Id.* at 411. Similarly, the Libby Opposition cites *United States v. Davis*, 974 F.2d 182 (D.C. Cir. 1992) for the proposition that defendants in criminal cases are "guaranteed" the right to call witnesses favorable to the defense, Libby Opp. at 4, but *Davis* rejected the defendant's argument that his Sixth Amendment right to testify in his own defense was violated by prosecution warnings that he would be charged with perjury if he testified falsely. *Id.* at 187–89.

In fact, it is well-settled that the Sixth Amendment "does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (Rule 17 requires a defendant to make a showing how the sought after testimony would be "both material and favorable" before

his constitutional right to compulsory process is implicated); *see also Taylor*, 484 U.S. at 410 (a defendant "does not have the unfettered right to offer testimony that is incompetent, privileged or otherwise inadmissible under standard rules of evidence."); *United States v. Libby*, 432 F. Supp. 2d 26, 47 n.26 (D.D.C. 2006) (hereinafter "*Libby I*") ("[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions") (internal citations omitted). In *Valenzuela-Bernal*, the Supreme Court reasoned:

> [t]hat the Sixth Amendment does not guarantee criminal defendants the right to compel the attendance of any and all witnesses is reflected in the Federal Rules of Criminal Procedure. Rule 17(b) requires the Government to subpoena witnesses on behalf of indigent defendants, but only 'upon a satisfactory showing . . . that the presence of the witness is necessary to an adequate defense.

458 U.S. at 867 n.7.

In this Circuit, the authority of trial courts to quash Rule 17(a) subpoenas issued by defendants is well-established. *See, e.g. United States v. North*, 910 F.2d 843, 889–92 (D.C. Cir. 1990); *United States v. Dean*, 55 F.3d 640, 662–63 (D.C. Cir. 1995). Although *North* involved a subpoena issued to the President and implicated issues of Executive Privilege, the subpoena was quashed on the traditional ground that the defendant failed to show that the testimony was "relevant and material to [defendant's] claim that he lacked criminal intent." *North*, 910 F.2d at 889. In *Dean*, the Circuit Court once again upheld the trial court's determination that Rule 17(a) subpoenas should be quashed because the sought after testimony was not material to the defense, explaining that "a witness' testimony is material [only] if its absence actually prejudiced the defendant's ability to mount a defense." 55 F.3d at 662–63. Clearly, these authorities recognize that when a witness seeks to quash a trial subpoena issued by a defendant, even where a constitutional or evidentiary privilege is not at issue, the trial court must assess the defendant's

need for the testimony. Thus, these authorities belie Mr. Libby's position that where a defendant issues compulsory process to a witness "no balancing of interests is required." Libby Opp. at 2.[1]

## II. Mr. Libby Inaccurately Characterizes the Viability of the Reporter's Privilege and Its Applicability to the Facts of This Case.

The Libby Opposition selectively quotes from this Court's earlier decision regarding Rule 17(c) subpoenas *duces tecum* issued to certain journalists and media organizations to support Mr. Libby's argument that there is no First Amendment or common law Reporter's privilege cognizable in this Circuit in criminal cases. Libby Opp. at 2. We respectfully submit that this is an erroneous characterization of the reach of the Court's earlier decision in *Libby I*. Indeed, we believe the Court made clear that the intended scope of its holding was a narrow one, and did not reach the issue now before the Court.

Before discussing the First Amendment and common law principles implicated by the issuance of subpoenas *duces tecum to* journalists, this Court stated:

> [I]t is important to emphasize that this Court has previously limited what documents need to be produced to those relating to the principal news reporters in this case – Miller Cooper and Russert. These three news reporters did not simply report on alleged criminal activity, but rather they were personally involved in the conversations with the defendant that form the predicate for several charges in the indictment. Their testimony is critical to the government's case, and challenging it will be critical to the defense. *Thus, the Court is only concerned here with whether a reporters' privilege exists to shield from disclosure documents relating to these three news reporters.*

---

[1] The remaining authorities cited by Mr. Libby in support of his position on this point are inapposite. *Irons v. Karceski*, 74 F.3d 1262 (D.C. Cir. 1995) concerned an attorney subpoenaed as a fact witness who sought to be compensated at his hourly billing rate, rather than the $40 per day rate prescribed by 28 U.S.C. § 1821(b). *Washington v. Clemmer*, 339 F.2d 725 (D.C. Cir. 1964) upheld the right of the accused in a sexual assault case to compel the appearance of the complaining witness to testify that she could not identify him as one of her assailants.

4

*Libby I*, 432 F.Supp.2d at 43 (emphasis added); *see also id.* at 48 (noting limit of holding to three reporters who "are themselves critical to both the indictment and prosecution of criminal activity.). Thus, we believe the Court plainly did not intend to rule, as Mr. Libby now argues, that "in this case" the defendant may subpoena journalists with impunity. Libby Opp. at 2.

Rather, we submit, the Reporter's privilege remains very much at issue in the circumstances of the subpoena served upon Mr. Sanger. Given the Court's familiarity with the relevant precedent, there is no need to reiterate here the importance of the *public's* interest in unfettered news gathering. *See, e.g. Libby I*, 432 F.Supp.2d at 44–45.[2] We believe, however, it is important to recall that, as this Court has recognized, "the question of whether there is a First Amendment reporter' privilege in criminal prosecutions is still wildly disputed." *Id.* at 46 (reviewing cases). It was unnecessary for this Court to settle this dispute on the facts before it in the subpoena *duces tecum* proceedings. Indeed, the Court expressed the view that its narrow ruling would "not swing open the gates" to allow the government or defendants "to gain all information a reporter has amassed" given that, under *United States v. Nixon*, 418 U.S. 683, 699–700 (1974), defendants still had the burden of demonstrating that any information sought from reporters was relevant, admissible, and specific. *Libby I*, 423 F.Supp.2d at 48. We believe that,

---

[2] The Libby Opposition strains to create the impression that Mr. Sanger is seeking merely to protect *his* interests. *See, e.g. id.* at 3 ( characterizing as inadequate "Mr. Sanger's generalized interest in confidentiality"). But as this Court has recognized, it is the public's interest in a free press that is impaired when a journalist is compelled to testify. *Libby I*, 432 F.Supp2d at 43. Moreover, that there are substantial First Amendment and common law interests entitled to protection, in addition to the identities of confidential sources, is inherent in the extensive authority in this Circuit recognizing that the "source" is not entitled to waive the privilege for the reporter. *See* cases cited at David E. Sanger's Motion to Quash Defendant I. Lewis Libby's Rule 17(a) Subpoena and Supporting Memorandum of Law ("Motion to Quash") at 8–9; *see also United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("[t]he privilege belongs to CBS . . . and it may be waived only by its holder.").

on the facts presented by the subpoena issued to Mr. Sanger, it is still unnecessary for this Court to resolve this "profound constitutional question of first impression in this Circuit." *Id.* at 45.[3]

### III. The Subpoena Issued By Mr. Libby Seeks Testimony That Is Immaterial, Cumulative and/or Available From Alternative Sources.

The important constitutional and historical principles underlying the public's interest in uninhibited news gathering should inform the Court's exercise of its traditional, discretionary review of Rule 17 subpoenas. *United States v. Bennett*, 675 F.2d 596, 598 (4th Cir. 1982) ("[n]either rich nor poor defendants have an unfettered right to subpoenas without discretionary review by the district court."). The decisions in *Nixon*, *North*, and *Dean* recognize that trial courts can and should exercise their substantial discretion to determine whether testimony or documentary evidence proffered by either party to a criminal proceeding is relevant, material and admissible. A defendant's burden of production and persuasion under that precedent is certainly no lower in cases where the evidence sought to be admitted is the testimony of a reporter. Instead, given the indisputably important public interests that are implicated when a reporter is subpoenaed, trial courts should be especially vigilant in determining whether the testimony sought meets the applicable evidentiary requirements, is the best evidence available, and is not merely cumulative. Furthermore, the trial court should take account of whether the proffered

---

[3] This Court did recognize that *United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000) could stand for the proposition that trial courts may balance the interests of defendants in criminal cases, and the interests of reporters to whom those defendants issue subpoenas. *See Libby I*, 423 F. Supp. 2d at 45–46. Mr. Libby argues that *Ahn*, and *United States v. Hubbard*, 493 F. Supp. 202 (D.D.C. 1979), which also recognized the existence of the Reporter's privilege in criminal cases, are not relevant precedent because they considered the issue in connection with criminal pre-trial proceedings rather than in the context of a criminal trial. Libby Opp. at 3. This Court certainly did not distinguish these case authorities on that ground. *See Libby I*, 423 F. Supp. 2d at 45–46 & n. 23. Furthermore, given that the Sixth Amendment governs all phases of criminal adversary proceedings, *see Estelle v. Smith*, 451 U.S. 454, 469–70 (1981), cases construing the scope of the Sixth Amendment in pre-trial, post-trial and sentencing proceedings are equally relevant to the analysis of the scope of those rights at trial.

6

evidence concerns events that "form the predicate for [the] charges in the indictments," *Libby I*, 423 F. Supp. 2d at 43, or "bear[s] only a remote an tenuous relationship to the subject of the investigation." *Branzburg v. Hayes*, 408 U.S. 665, 710 (1972) (Powell, J., concurring).

The decision in *United States v. Hubbard* illustrates the careful application of tried and traditional standards for enforcement of Rule 17(a) subpoenas to a defendant's effort to compel the testimony of a reporter in a criminal case. The defendant in *Hubbard* subpoenaed a reporter to testify about an FBI briefing for which the reporter was present. The *Hubbard* court recognized that the Reporter's privilege was available in criminal cases, but then applied traditional evidentiary standards in determining that the subpoena to the reporter in that case should be quashed. 493 F. Supp. at 205. Specifically, the trial court found that "the testimony the reporter could offer would be merely cumulative and less than the best available evidence." *Id*. That finding was premised upon the fact that other witnesses were available to testify about the briefing, "including an FBI agent who testified with the assistance of notes." *Id*. In these circumstances, the *Hubbard* court reasoned, the reporter's testimony was "far less than necessary to a fair resolution of the case." *Id.*; *see also United States v. Cuthbertson*, 630 F.2d at 148 ("the district court should not be required to make the delicate balance of interests required by the [Reporter's] privilege unless the defendant first shows that he is unable to acquire the information from another source that does not enjoy the protection of the privilege.").

As demonstrated in Mr. Sanger's Motion to Quash, the testimony sought from Mr. Sanger is of minimal relevance and is immaterial to the charges pending against Mr. Libby. *Id.* at 5–6. Mr. Sanger's expected testimony would encompass what *was not said* by Mr. Libby during an interview that is not certainly not a predicate for any of the charges in the indictment. Moreover, as in *Hubbard*, the testimony Mr. Libby expects to elicit from Mr. Sanger would

7

clearly be cumulative. Mr. Libby has now acknowledged that Ms. Martin was present for the July 2, 2003 interview of Mr. Libby conducted by Mr. Sanger. Libby Opp. at 5. And the government almost certainly would stipulate to her presence during the interview. The jury already has heard from Ms. Martin on the subject of Mr. Libby's statements to reporters when Ms. Martin was present for any such interview:

> Q. [by Mr. Wells] Now is it correct that you have absolutely no knowledge of Scooter Libby ever discussing with any reporter, any information concerning Mrs. Wilson or her employment status?
> A. I have no knowledge of that.

*See* January 25, 2007 Transcript of Trial, Afternoon Session at 46 (copy attached at Motion to Quash, Exhibit C. Thus, it is clear beyond dispute that: (1) Ms. Martin has already provided the "exculpatory" testimony Mr. Libby now seeks from Mr. Sanger; and (2) she is available to Mr. Libby to testify to whatever additional details regarding the July 2, 2003 interview that he deems important to his defense.

In response to the showing made in Mr. Sanger's Motion to Quash that Ms. Martin is an alternative source of the information for the evidence sought by Mr. Libby, the Libby Opposition argues that: (1) it is preferable that the jurors hear the testimony from a witness who is "neutral"; (2) Mr. Sanger can dispel any suggestion, caused by Ms. Martin's "leak to Sanger" note, that Mr. Libby thereafter leaked information regarding Ambassador Wilson's wife to Mr. Sanger; and (3) the defense challenged Ms. Martin's credibility on cross-examination, so it should not be expected to call her as a defense witness. Libby Opp. at 5–6. The first of these arguments is counter-intuitive. It is invariably more advantageous for the defense to elicit exculpatory facts from a witness called to testify by the government, and Mr. Libby already has obtained Ms. Martin's concession on cross-examination that she has no knowledge of Mr. Libby discussing Mrs. Wilson or her employment status with reporters. The argument that Ms. Martin may not be

credible as a defense witness because Mr. Libby questioned her memory during cross-examination ignores the fact that, as the defense well knows, Ms. Martin prepared notes of the July 2, 2003 Sanger-Libby interview, and those notes would corroborate her testimony (and the defense's position) that the Wilson-Plame connection was not a topic discussed during the July 2 interview. To suggest that Mr. Sanger's testimony is necessary because the government may contend she is mistaken about what did, or did not, transpire during the July 2 interview, is specious.

The remaining argument made by Mr. Libby as to why Mr. Sanger's testimony is not cumulative of that given by Ms. Martin -- the contention that only Mr. Sanger can dispel the suggestion caused by Ms. Martin's "leak to Sanger" note -- is flatly refuted by reference to the time line. The phrase "leak to Sanger" appears in Ms. Martin's notes regarding possible strategy (Government Ex. No. 541) that were prepared by Ms. Martin on the evening of *July 10*, more than a week *after* the interview of Mr. Libby conducted by Mr. Sanger. *See* January 25, 2007 Transcript of Trial, Afternoon Session at 7–12. (Copies attached hereto as Exhibit A). There is no evidence in the record that Mr. Sanger met with Mr. Libby on or after July 10, and therefore no need for Mr. Sanger to "dispel" any suggestion that there was any "leak to Sanger" after these notes were prepared.[4]

---

[4] Ms. Martin's testimony regarding these notes illustrates yet another reason why the testimony sought from Mr. Sanger by Mr. Libby is immaterial. Ms. Martin explained the White House rationale for "leaking" information to just one reporter where the objective is getting press attention to the information. *Id.* at 11–12. As Ms. Martin explained, giving a reporter "an exclusive" increases the prospect of publicity because "if you give it to one reporter, they're more likely to write the story if they think its news and if they think it has just been given to them." *Id.* Under this rationale, the testimony sought by Mr. Libby from Mr. Sanger -- that he was not the recipient of a leak regarding Mrs. Wilson on July 2 -- would make it no less probable that Mr. Libby provided that very information to Judy Miller on June 23.

In sum, Ms. Martin has already testified to the very same "exculpatory" information that Mr. Libby insists he needs to elicit from Mr. Sanger. In the event that Mr. Libby, for tactical reasons, prefers to feature this exculpatory fact during the presentation of his defense case, Ms. Martin is available to Mr. Libby to testify regarding the discrete, and almost certainly undisputed, fact that Mr. Libby did not disclose Mrs. Wilson's identity or occupation to Mr. Sanger on July 2, 2003. Thus, the Libby Opposition is plainly wrong in contending that Mr. Sanger, by seeking through his Motion to Quash to further the public's interest in unfettered news gathering, is "stonewall[ing]" Mr. Libby's efforts to obtain evidence establishing his innocence. Libby Opp. at 2.

## CONCLUSION

For the foregoing reasons, the Court should quash the subpoena issued by I. Lewis Libby to David E. Sanger.

Respectfully Submitted

By: _____
Charles S. Leeper (#310367)
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 842-8800

*Attorney for David E. Sanger*

February 5, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of February, 2007, a copy of the above and foregoing **Reply of David E. Sanger to I. Lewis Libby's Motion To Quash Rule 17(a) Subpoena**, and attached exhibit was sent via electronic and U.S. mail:

John DeWitt Cline
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104-1500
(415) 875-5812

William H. Jeffress, Jr.
Alex Joseph Bourelly
Alexandra M. Walsh
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
The Warner
Washington, DC 20004
(202) 639-7751

James Lewis Brochin
Theodore V. Wells, Jr.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, NY 10019-6031
(212) 373-3582

_____
Charles S. Leeper

NS

# Exhibit A

```
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2    ------------------------------X
 3    UNITED STATES of AMERICA    Criminal Case No. 05-394
 4              v.
 5    I. LEWIS LIBBY,
 6                  Defendant,
 7    ------------------------------X     Washington, D.C.
                                          Thurs., January 25, 2007
 8                                        1:30 P.M.
 9         TRANSCRIPT OF TRIAL, AFTERNOON SESSION
           BEFORE THE HONORABLE REGGIE B. WALTON
10         UNITED STATES DISTRICT JUDGE, and a JURY
11    APPEARANCES:
12    FOR THE GOVERNMENT:   PATRICK FITZGERALD, SPECIAL COUNSEL
                            DEBRA R. BONAMICI, DEPUTY SPEC. COUNSEL
13                          U.S. DEPT. OF JUSTICE
                            OFFICE OF SPECIAL COUNSEL
14                          219 South Dearborn Street
                            Chicago, IL  60604
15                          (312) 353-3741
16                          PETER ZEIDENBERG, AUSA
                            KATHLEEN M. KEDIAN, AUSA
17                          U.S. DEPT. OF JUSTICE
                            1400 New York Ave., N.W.
18                          Room 12-405
                            Washington, D.C.  20005
19                          (202) 514-1412
20
21    Court Reporter:       Lisa Walker Griffith, RPR
                            U.S. District Courthouse
22                          Room 6409
                            Washington, D.C.  20001
23                          (202) 354-3247
24
25    Proceedings recorded by mechanical stenography, transcript
```

Electronically signed by Lisa Griffith (301-154-552-1063)                     a9d74355-50ff-412f-a538-3afec3681753

1  something to do with this.

2  Q  Then what happened the rest of the week in terms of your
3  access to decisions about communication strategy?
4  A  We were not, I was not involved from about that point on
5  in any further discussions about how to deal with this story
6  with senior people. I still continued to talk to my press
7  colleagues in the White House about what we were hearing and
8  trying to keep track of it.
9  Q  Were you the only press person who was excluded from the
10 conversations at that point?
11 A  No, my understanding, in talking to my colleagues, was
12 that everybody was sort of in the dark about what other
13 conversations were going on in the White House amongst the
14 senior staff.
15 Q  Did there come a time when you spoke to Mr. Libby about
16 communications strategy later that week?
17 A  There did.
18 Q  Can you tell us when and where?
19 A  On Thursday evening about, of that week, which I believe
20 was July 10th, I had been monitoring whatever, to the extent
21 I could, what was going on in the media and letting them know
22 whatever I heard via e-mail et cetera. But I hadn't really
23 talked to Scooter. And I wanted to make sure, before I left
24 for the evening, that he didn't need anything.
25         So I either stopped by his office or called and

1  suggested, you know, if you need me, I'm here.  But if not,
2  I'm going to leave.  And Scooter said, you know what,
3  actually, can you hang on a second.  I'd actually like to
4  talk to you.  So he brought me into his office.  We talked a
5  little bit about, that I hadn't been involved in the
6  discussions that were going on.
7          He told me that there had been a decision not to
8  have communicators involved in these discussions.  But that
9  he would feel more comfortable getting the judgment of
10 someone that was in communications about what was going on.
11 Q  And continue with, anything else you recall about the
12 conversation?
13 A  The conversation was, and he said what's going on is
14 George Tenet is going to, we think, give a statement to the
15 press about the 16 words, how they got into the State of the
16 Union, and he'll make a statement.
17         And there have been discussions back and forth
18 about what that statement will say.  And we have a sense of
19 what it will say.  And I believe, maybe his assistant was in
20 the room, Jenny Mayfield.  And I believe she kind of had this
21 paper that had notes that seemed to reflect conversations
22 back and forth between the White House and George Tenet.
23         That, from the discussion, it's my understanding,
24 had been occurring through Steve Hadley, and Steve Hadley had
25 been relaying it back to us.  At some point during that

1  conversation, Steve Hadley calls and Scooter asks me to leave
2  the room since I was not supposed to be involved in this.
3       So periodically, I'm going in and out of his
4  office. It was my recollection. I sat in his outer office.
5  While I was there, I took some notes thinking about how I
6  could best advise them on the communications strategy about
7  this statement that might be happening. And when I returned
8  to his office and he got off the phone, we continued talking.
9  Q  Do you recall if anyone else besides Mr. Hadley was
10 calling in at that time?
11 A  I don't recall whether the Vice President called Scooter
12 or Scooter had to call the Vice President. But I think,
13 during that same conversation, there were conversations
14 between Scooter and Steve Hadley and Scooter and the Vice
15 President. And I left for both conversations with either one
16 of them.
17 Q  And when you went outside in the hallway or outside the
18 office, wherever you were, what were you doing?
19 A  Writing some notes to myself, looking at this piece of
20 paper that they had given me and trying to figure out what I
21 thought was the strongest statement that we could hopefully
22 get from Director Tenet in hopes that this would help clear
23 up some of the misperceptions that I believe were in the
24 press.
25       And also thinking about the Vice Presidential piece

1  of this, wanting to make sure that our little piece of that
2  was in there as well.  So I was writing some notes and I was
3  also trying to figure out what are the options for things we
4  can do, communications tactics and press strategy around this
5  statement because part of the discussion that we had had is
6  what if it's not strong enough.  Like, what if it doesn't
7  answer all the questions the press have about this story.
8  And there are still more questions.
9    Q  Could you explain to us what you mean by "the Vice
10 Presidential piece of this?"
11   A  Just, the talking points that we had been using.  We
12 didn't know who Joe Wilson was.  We didn't request his
13 mission.  The Vice President didn't receive a report about
14 his mission, that line of reasoning.
15   Q  And then what did you do when you eventually returned to
16 Mr. Libby's office after you wrote these notes out?
17   A  I think part of them were written outside, part of them
18 were written while I was talking to Scooter.  But I talked
19 with him, you know, what I thought about the statement, what
20 my concerns were, that what was being conveyed about how
21 strong the statement would be.
22          And said, you know, it doesn't end the story.  It
23 doesn't end there, then there are other things we can do.
24 Tomorrow is Friday.  I think I told him that there were, we
25 could go on the Sunday shows, which is one way to really

1  clean up something that's happened during the week because
2  the Sunday news talk shows always talk about what happened
3  that week.
4       So we would for sure talk about the story, so we
5  could put someone in, and I suggested we could put the Vice
6  President on Meet The Press, just a tactic we use when there
7  is a big sort of comprehensive discussion of it, the Vice
8  President would be the one to do that.
9       I told them there were a couple of reporters that
10 were currently working on stories that I thought we could try
11 to get in their stories. One of the tactics that you use in
12 the press world is to let's give an exclusive to a reporter.
13 I believe I wrote the word leak to a reporter in my notes,
14 which I meant as, it's a term of art to give it to that,
15 exclusively to that person.
16      I believe I suggested an out bed. We could have
17 somebody write an out bed or we could I think also give it to
18 a, talk to a columnist basically that would write a fuller
19 picture. Columnists tend to write the whole story, whereas
20 the reporter, they might just write the news for the day.
21 Q   When you say you'd give an exclusive, would you explain
22 to the jury why, if you wanted to get press attention to
23 something, you would just give it to one reporter rather than
24 all the reporters?
25 A   Reporters would like to have the story. And each

1  reporter, they're competing against each other.  So if you
2  give it to one reporter, they're more likely to write the
3  story if they think it's news and if they think it has just
4  been given to them.
5           In addition, you can give it to them and do it as a
6  senior Administration official.  You don't have to say this
7  is coming directly from the White House.  You can say I'll
8  tell you the full story but here is how we're going to do it.
9  Q   Let me approach you with what's been pre-marked for
10 identification as Government Exhibit 541.  Showing you
11 documents, two separate pages with two sides each, pre-marked
12 as Government Exhibit 541, do you recognize what that exhibit
13 is?
14 A   Yes.
15 Q   What is it?
16 A   It is, it looks like the typed document that I think
17 Jenny Mayfield gave me when I was in Scooter's office that
18 night summarizing the conversation that went on between the
19 White House and George Tenet about possibilities his
20 statement would say.  And then my notes that I wrote on it on
21 the back of each page about the statement and about this
22 press strategy.
23          MR. FITZGERALD:  Your Honor, I would offer
24 Government Exhibit 541.
25          MR. WELLS:  No objection.